Good morning, Your Honors. Kevin Kiley on behalf of Petitioner Clatskanie Peoples Utility District and Intervenor Public Utility District No. 1 of Grace Harbor County. With me on the briefs and present with me at council table this morning is my partner, Ray Kindly. Your Honors, the question before this court is whether the Bonneville Power Administration was lawfully authorized by Congress under Section 5C of the Northwest Power Act to execute residential exchange program contracts, whether styled as interim or otherwise, and then make payments to investor-owned utilities under those contracts without first complying with the Northwest Power Act limitations on such contracts. Before we get to the merits, can we talk about the jurisdictional issues? And my first question was, what is the current status? Has the, I guess it's the WPO7 supplemental right proceeding been concluded? Have the interim agreements have been voided? Has the true-up of payments occurred? Or if you could just tell us briefly what the current state of affairs is. Sure. And obviously the BPA and the intervenors will weigh in on that as well. With respect to the, Your Honors' question about jurisdiction, let me start. If it's all right, I'd like to start with that and then move into where things are under the supplemental right proceeding case. With respect to jurisdiction, this court has subject matter jurisdiction under Section 9 of the Northwest Power Act to review final actions of the Bonneville Power Administration. That same Section 9 contains eight actions of the BPA that Congress has already deemed to be final actions. One of those is the execution of a residential exchange program contract. This court has repeatedly held that if one of those deemed final actions is invoked for subject matter jurisdiction purposes, that that ends the finality inquiry. The Section 9 further provides that any petitioner must challenge the final action within 90 days of the action in question. In this case, the execution of those residential exchange program contracts by the BPA and the intervenor IOUs. So that answers the subject matter jurisdiction question. With respect to standing, which I'm sure is a preview of coming attractions from the- It indicates that the dollar amounts may change, but not the contract provisions themselves. And we're challenging- You're saying, your argument on standing is the payment of these dollars takes away from what we could get. So dollars are important. That is, they are important, but that's only one prong of the standing argument, Your Honor. But doesn't it also make the interim contract not final agency action since they will be in effect predictably changed in WD-07? Well, as I understand it, the WP-07 supplemental rate proceeding has concluded. But those contracts are not void. They're not done. They have a life of their own. They remain and will remain for years because the provisions for the true-up are told, if you will, by Section 9 of those agreements until such time as any opportunity for judicial review or challenge of the record of decision in the supplemental rate proceeding has concluded. They're told. And then, even only then, the time period, which is three years under the agreement, for the true-up starts to run. And that provision of the agreement- Let me interject because I really would like to get, and I think you can do it in just a moment, an answer to Judge Akuda's question. My understanding, and you can just say yes or no, is that we've had a final decision on WP-07 supplemental proceeding and that FERC has approved. Is that correct? There has been a final decision, but my understanding is that FERC has not issued a final decision on review. FERC is not yet approved. So it's still pending in FERC for a final decision? I would defer to the gentleman from BPA. Oh, okay. So it's still pending in FERC. That's right. And I also understand that there have been many petitions for review filed already challenging that decision. So we're into more years of litigation over that. And until we get a final judgment on that, these interim contracts are operative? At the very least. And, in fact, for three years beyond that, Your Honor, because the time period for true-up doesn't start to run, if, in fact, it's concluded that the IOUs owe the BPA money, they've got three years to pay it. And in the meantime, if one of those IOUs goes under or has some other problem, then what the BPA is left with is a contract claim against that entity. But as I understand the result of the WPO7 supplemental rate proceeding, the decision is that more money is owed to the IOUs and more money is owed to the preference customers both, correct? That was the BPA's conclusion. Assuming that stands, BPA is not going to get refunds from either the IOUs or from the preference customers. It's going to owe them money. So your hypothesis of, well, they're going to be bankrupt so they can't pay any money back, that sounds like a pretty far-fetched hypothesis because under the ROD, it's the BPA that owes them money, correct? That's what the BPA concluded. That decision is far from final. With respect to standing, Your Honor, it's interesting that 25 years ago, one of the intervenors in this case, PGE, stood where I stand today as a petitioner in the PGE v. Johnson case. In that case, the BPA had changed the power rate amounts in contracts to its direct service industrial customers without a 7i rate proceeding having been conducted beforehand. The PGE challenged that. The BPA in that case, as it has done here, suggested to the Court that PGE did not have standing and that its actions were justified under the various and sundry business discretion provisions of the Northwest Power Act. The Court disagreed and sided with PGE. It based its standing decision on two factors. One, that the petitioner, PGE, alleged a financial injury as a result of the BPA's action, and the Court, as it has done in many decisions subsequently, said that for standing purposes the Court will accept that allegation to be true. Laskin and I made a similar allegation in this case. Two, and perhaps at least equally important, the Johnson Court decided that PGE has standing to challenge a contract change by the BPA by virtue of its status as a customer of BPA and its right to participate in the hearings process mandated by the Northwest Power Act, and that if the BPA could take actions and ignore the provisions of the Northwest Power Act without complying with its strictures, then those provisions, like the 7i rate proceeding requirement, would be rendered meaningless. And on that basis the Court found an alternative basis for standing that has been lied on subsequently. Can you help me with respect to your case, not with respect to that one, but with respect to your case understand, help me understand how these interim contracts hurt your client? Because I'm not sure I understand that. Well, they hurt my clients in two ways, Your Honor. One is it's our contention that had BPA followed its average system cost rate methodology that was used in the initial WPO7 rate proceeding in which it was concluded that $29.4 million was owed to the IOUs, that that's all they would have got. And, in fact, they got $110 million, and it's our contention that that difference under the methodology in place at the time should have been available to distribute to the public power preference customers. That's one. Two, by end run around the Help me understand. I don't understand why that would have been available and would have been distributed to your client. Well, whether it would have been distributed or not, I suppose, would have been up to the BPA. Their claim here is that they had an exigent circumstance by virtue of the fact they had too much money in the bank, which in today's world is a pretty good thing to have. Well, the exigent circumstances was they were getting the daylights beat out of them by all the politicians in town. And they bowed to the political pressure, and they circumvented the Northwest Power Act, and Congress does not allow that, and this Court put a stop to that kind of thing once and for all, I would contend, in the PGE case. Was there anything in the act that segregated the difference between $24 and $110 million for payments as rebates to your client? Your Honor. Or could they have used that windfall, let's say, by giving bonuses to their high-ranking executives the way that some other companies have? The Bonneville Power Administration, despite the fact that it likes to consider itself to be run like a business, is a federal agency, and its primary mandate is to provide preference power to the public agencies that it serves at the lowest possible cost. It can't go off, as the Court said in the PGE case. It can't buy the trailblazers. It can't create a rodeo. It can't do other things with this money. It has to protect the interests of the public power preference customers first. But at the time of the true act, won't your client get whatever it is that it's owing to it? And if the interim agreements hadn't been there, nobody would have gotten any money. So I'm having trouble seeing where the injury was. Well, again, Your Honor, I would respectfully suggest that it's the reason why I said that the two-pronged standing conclusion of this Court in PGE v. Johnson is important here, because if you disagree with our contention that the monetary claim is a basis for standing, the Johnson Court and subsequent opinions from this Court cited in the materials concluded that PGE in that case, Klatske and I, and Grays Harbor in this case, have standing to challenge this contract action by the BPA as a customer of the system. And, in fact, the Hodgson's choice of their standing, even without any showing of monetary injury to themselves, that's the argument? Correct. It's an alternative basis of holding in the court case. Well, I'm not sure whether we were right when we decided Johnson, but that does not seem to be consistent with subsequent Supreme Court case law. Well, it's not just Johnson. I mean, the CDEC case, I'd have to get the site if Your Honor's interested in. I can do that when the other side's up. But it actually makes a great deal of sense, because the requirement is not merely financial injury. It's injury in fact. And the injury in fact that the Court found in the Johnson case and in subsequent cases is the deprivation of our rights to – our clients' rights to participate in these congressionally mandated procedures. That's an injury in fact that justifies standing. But given what's at issue here, I mean, and I don't mean this derogatorily, the only thing at issue in all of these proceedings under the BPA is money. I mean, we're not talking about dignitary interest of individuals who might have been defiled or right to – we're talking about money. I mean, that's what all these fights are all about, and they're important fights, but they're not about anything other than money. Your Honor, I've been practicing law for 25 years, and I think I haven't handled a case yet where at some level somebody couldn't say it's about the money. But in this case, it's not just about the money. It's because the money is to be doled out pursuant to the congressionally mandated requirements in the Northwest Power Act, and if BPA can circumvent those any time it wants by creating a trumped-up exigency and bowing to political pressure, ignoring Section 5C's requirements, ignoring Section 7B's rate ceiling test, ignoring its obligation to conduct a 7I rate-making proceeding, then it can do it any time to anybody, and those rights need to be protected. And in fact, Congress has said that if we did not do so within 90 days of the date of the execution of that contract, we'd be forever barred from doing it. And you know what? My guess is BPA would have said in that subsequent proceeding, sorry, fellas, you can't challenge those contracts. You didn't file a petition for review in 90 days. I understand that, but I'm trying to figure out whether you can show any financial injury from this. I mean, I'm kind of where Judge Aikuda is. There's going to be a true-up. It may not be for a while, but assuming that the FERC approval comes through, assuming that the challenges then go forward, and assuming finally that we actually get the true-up, in what fashion have your clients been financially hurt? I would answer that question in two ways, Your Honor. First, the question of standing is to be determined at the time of the filing of the petition. And at the time of the filing of the petition, the WPCO... You know, you didn't answer me. You're not answering my question. How would your clients be hurt? At the end of the day? Yeah. They'd be hurt by a deprivation of their rights under the Northwest Power Act. Would they be hurt financially? Maybe. We don't know. If they might be hurt financially, how would that occur? I mean, sketch this out for me so I can get a sense as to whether it's likely. Well, whether it's likely is in the eye of the beholder. But the separate proceeding that is far from over yet, we don't know the result of that. So it's very difficult for me to speculate about how that might come out. I've offered you one scenario. But, again, I would submit that by virtue of paying out that money in violation of the Northwest Power Act, that was an action contrary to law by BPA. And with respect, this Court should not allow that to stand on a no harm, no foul kind of analysis. It reminds me, Judge Fletcher, of what you said to one of the counsel earlier this morning about the Fourth Amendment. Well, those little house rules, I would hope here that all the judges and lawyers, we would call those house rules the rule of law. And we're bound to live by the rule of law, and so is the BPA. They didn't do it in this case. And under this Court's precedent, we have standing to challenge that. We're required to do so within 90 days under the Northwest Power Act, and we did. That's why we're here. Let me ask a different, this is sort of a practical question. I don't know whether it will end up having any legal consequence. Most of the preference customers accepted the interim agreements. Your clients did not. How come? I don't know the answer to that, Your Honor. I think they probably felt like it was an attempt to buy everybody off and buy peace and circumvent their parties' respective rights under the Northwest Power Act, and they wouldn't go for it. Sometimes the enemy of the people is the one who stands up for the rule of law. Other times people don't. You know, if we agreed with you all along the way and said, you're right, the interim agreements were in violation of the Act, what is the remedy or the relief that you're looking for? Because we would say you have to do these calculations per your rate-making requirements, and that's apparently what they're doing, and now it's pending before FERC. So what relief would you get? I'm glad you asked that question, Your Honor, in the three minutes that I have remaining. We submit that what this Court should do is exactly what it did in the PGE case and in the later Snohomish case, both of those cases decided in 2007 and cited in the materials. The BPA has some leeway and some options, as the Court noted in both of those cases, about what to do when it's violated the law. And in both of those cases, this Court remanded the action to the BPA with a declaration that the contracts were contrary to law and directed the BPA to fix it, to take further actions consistent with this opinion. And in the Snohomish case, the Court noted, probably as an academic exercise, frankly, that there were several options open to the BPA and that the Court was taking no opinion on which one was best, but that given that the original settlement contracts of 2000 violated the law, the BPA had to act consistent with the law in resolving the problem. And that's one of the BPA's big beefs here is that they had this terrible problem. Well, the terrible problem was created by the BPA nine years ago now when it entered into those settlement agreements that violated the law. And then it tried to fix it, and it didn't do a good job. It's still violating the law. So I would submit that the suit the BPA finds itself in is of its own making. Had it followed the congressionally mandated directives nine or ten years ago, this proceeding probably would have been concluded and we wouldn't be here this morning. I have a minute 30 left, and I'd like to reserve a little bit of time for rebuttals. Why don't you reserve, and we'll make sure you get a chance to say what you need to say. Thank you. So I would conclude then, as I answered I think already the question by Judge Ikuda, that in failing on the merits to first apply the average system cost rate methodology that had been in place since 1984 as mandated by 5C of the Northwest Power Act, by failing to apply the rate ceiling test of 7B, and by failing to conduct a 7I rate proceeding with full-blown opportunity to comment and participate, the BPA violated the Northwest Power Act, and that should not be allowed to stand. This Court should declare the contracts to be contrary to law and remand to the BPA for further action consistent with the Court's decision. Thank you. Thank you. Thank you. Good morning, Your Honors. May it please the Court, my name is Richard Green. I'm an attorney with the Bonneville Power Administration. I'd like to recognize at Council's table today Steve Liddell, Assistant U.S. Attorney's Office. Oh, he's actually back there. Next to me is Dan Bagatelle, Counsel for the Investor-Owned Utilities, and next to him is Eric Christensen, Counsel for the Snow-Homeless P.U.D. I'd like to reserve five minutes of our time. Are you going to split our time? Yes, I'd like to reserve five minutes of my time for Mr. Bagatelle. Okay. So I'll take 15 minutes up. I think the Court has actually hit upon the key issue in this case, which is whether there's any sort of injury to Klatske and I at this point. And as the Court, I'm sure, conceived through our brief, we've laid out three grounds for why this Court should dismiss this case at this point. I'd like to talk about the ripeness issue and then move to the standing and then go to the merits if I have time. I think we've outlined the finality issue in our brief and our motion to dismiss, and so I'd like to focus on those two points first. Could you briefly touch on what the current status is? Certainly. So the WP-07 rate case has concluded. We received interim approval of our rates from FERC on October, I believe, 30th. That might be before then, of 2008. But the case is still pending before FERC, and it's our position that under 94D of the Northwest Power Act, it does not become a final action until FERC grants final approval. I'd also like to note to the Court, though, that there are currently cases pending before this Court on the underlying record of decision, and there's some concerns about the jurisdiction, about whether the Court can hear the rod separate from the rates. But the rod has been issued, and the rates are still pending before the Commission. I'd like to move to the ripeness issue and focus on first whether these issues are fit for judicial review now. And it's the government's position that it's not because the interim agreements themselves, as I think the Court has identified, does not establish whether the IOUs at the end of the day get any money from BPA. It is completely dependent upon the decisions that BPA makes in the WP-07 supplemental rate proceeding. So whether there's any injury or whether there's any impact to Klatske and I from Bonneville executing the interim agreements and making the interim payments, it's not determined at this stage of the case. It will come to the extent there's any injury at that point once the WP-07 supplemental rate proceeding is before this Court. So there's no Now, that sounds as though you're conceding that these interim agreements may indeed have an adverse economic impact on Klatske and I. Do you mean to concede that? No, Your Honor. I'm not conceding that it has an adverse economic impact. All I'm saying is that there You're conceding that they might have an adverse economic impact. If there's any impact related to the interim agreements, it will come once the 07 supplemental rate record is before this Court, because that's the point that Bonneville Let me keep bearing down on this. You said if. Is there a possibility of an adverse economic impact on Klatske and I because of these interim agreements? Because of the interim agreements? No, not because of the interim agreements. It will, to the extent there's any impact on Klatske and I, it will come as a result of the decisions in the 07 supplemental rate case wherein the administrator will determine what is the level of benefits, exchange benefits, that the IOUs are entitled to for the period covered by these agreements. And that decision is not determined as a component of the interim agreements. The interim agreements really are simply just a mechanism that, to the extent the administrator later makes this decision, allows it to be distributed in a timely and proper manner. But whether they get any payments is completely dependent upon the decisions that the administrator makes in the 07 supplemental rate case wherein the full procedural protections of 5C, the 1984 ASC methodology, and 72 are provided. Is it possible that under the interim agreements so much money is paid out that there won't be anything left under WPO7 to be paid to Klatske and I? No, Your Honor. So in the WPO7 supplemental case, EPA made a determination as to what the publics were entitled to for refunds for a period of time. And what we did is we treated all the customers, all the preference customers, who did not sign an interim agreement in the same exact fashion as those that did. And so Klatske and I did get a refund from EPA, just as every other preference customer did, and they actually got interest on their refund in addition to the refund that they got. So it shouldn't have an impact on Klatske and I. Oh, so let me make sure I understood that. I did not understand that. But Klatske and I and the other preference customers who didn't sign the agreements are nonetheless getting the amount of money they would have gotten had they signed the agreements. Absolutely. And so the only thing that they're free from is the obligation to refrain from suit, which is why we're here? Basically, yes, Your Honor. And I'd like to cite to the record actually where we discussed this very issue in response to comments. I mean, there are preference customers coming in to us during this time period when we're offering these agreements asking us, well, what if we don't sign? I don't want to be harmed. And Bonneville said, you know what, you're absolutely right. When we go into our supplemental proceeding, we're not only going to calculate a refund for you as if you did, but that's not all. We're actually going to give you interest on it so that you get actually the time value of money that the other preference won't get. So Klatske and I not only got the refund from Bonneville at the conclusion of the 07 supplemental case, they got additional interest on it to keep them in the same financial position as if they had signed the interim agreements. And just let me get that cite for the court so it can see it. And they actually got money, not just you're anticipating giving it to them at some point. Yes. They actually did get cash payments from BPA at the end of our case. And the citation in the record is excerpt of record 113, 113. And it explains this issue. It's in the response to comments where a party raised this issue and we responded to it. And they got this money when? I think you said it, but I want to make sure I understood this. I believe, and this is subject to check, and we can provide a letter if I'm wrong on this, but I believe it was at the conclusion of the WPO7 supplemental rod. And that was issued on September 29, 2008. So shortly thereafter, we provided payments to the preference customers. I see. So they didn't get the payments at the time the original preference customers who signed up to the agreement got it, but they got the equivalent plus interest at the time that you guys did your ROD. Yes. Once the rod was issued. At the end of the day, in WPO7 supplemental proceedings, you find that there isn't any rebate. And the monies that have been given under the interim agreements should not have been given, and you've got to get some money back. And that will all be done on an equal basis to the people who did sign agreements and who didn't sign agreements? The contract provides that there's an actual mechanism for returning those dollars to BPA. And when we're talking about the IOUs, there's a Section 9B of the contract, Section 9A and B, explains how Bonneville gets that money back from the IOUs. For the preference customers, I believe they have a similar provision in there, although the issue is not as important for this case because the preference customers' contract is not before us today. So I don't know if it's – if Bonneville gets remanded or reversed in the O7 supplemental case, we'll have to figure out how to get the money back from those who didn't sign the contract because we don't have a mechanism in place right now. Klatske and I mix the second argument that even if we find there's no financial injury, that they have a right to BPA following the procedural requirements that we have recognized as giving standing in the CEC case, the Johnson case. How do you respond to that argument?  First, we did give Klatske and I the opportunity to come into a BPA rate proceeding and argue about what level of payments the IOUs should get at the end of the day. And that was the WPO7 supplemental rate proceeding. So the contracts don't establish that the IOUs get any money. It says whatever Bonneville decides in that rate proceeding is what the IOUs get at the end of the day. And Klatske and I participated in that proceeding and they had the full panoply of procedural and legal rights provided by the Northwest Power Act and 7i process to argue that Bonneville wasn't doing it correctly, that Bonneville wasn't following the 84 methodology. They had those procedural rights in the O7 supplemental rate case. But that doesn't respond to the separate interim agreements, which was arguably, as they argue, a rate making proceeding sort of on the side. So they didn't have the opportunity to participate in that decision making. Well, we held a comment process on whether to execute the contract. So they did participate in that respect. But the interim payments themselves really don't have any impact on them because they're just temporary payments. They are temporary, subject to true-up to these decisions in the O7 supplemental case. So viewed in isolation, they have no impact on Klatske and I. And Klatske and I can completely undo any alleged harm that they would have from those interim payments by going into the rate case and saying the IOUs should get zero. If they succeeded in making that argument in the O7 supplemental rate case, the way the contract operates is it simply says, what does the WPO7 rate case say? It says zero. We true the IOUs up to zero so they return all the money back to BPA plus interest. Isn't that sort of avoiding the procedural injury argument, though? Because you're essentially saying they had no procedural injury, even if you did the procedure wrong in the interim agreements, because there was no financial injury. And they're saying, well, no, we have an independent right to have BPA follow the statute which says this is how you make these sorts of decisions where you're giving money back to your customers. And can we get around our cases, the couple of cases which say, yes, that gives standing? Go ahead. Okay, sorry. I think the key issue in the PGE Johnson case and the CECB Johnson cases, the key procedural injury there was the interim action that BPA was taking was completely disconnected from BPA's rate processes. In those cases, BPA was also taking interim action and was conducting a rate case at the same time. Now, the interim action was a separate independent final action. There was no revisiting Bonneville's decision to provide the, whether it be the DSIs, a lower rate, or to buy worthless scheduling rights from PGE. But there was no revisiting Bonneville's decision. It was once BPA made the decision, it was made. In this case, however, the interim action is inseparable from Bonneville's rate proceeding so that they have an opportunity to come into this rate case and completely undo the effects of the interim agreements, which in the PGE case and the CECB Johnson case, that's what this Court was responding to was there was no opportunity for the petitioners to come in and argue you should be changing this, you should not be providing these interim payments or changing your rates the way you have. And that's a right that Klaske and I does have in this case. I also want to make a real clear point, Your Honor, that there's no hardship to Klaske and I to waiting until the 07 supplemental rates are before this Court. First, looking at the near-term picture, Klaske and I's rate did not change a dime the day before and comparing the day before and the day after BPA made the interim payments. It didn't. They were paying the exact same rate. So the interim payments had no effect, immediate impact on them once BPA made the payments. And secondly, I'd like to just emphasize that BPA has conceded in our brief and our motion to dismiss that Klaske and I can bring as a challenge in the WPO7 case its challenges to the interim agreements, including our authority to execute those agreements and make the interim payments. And that makes sense because the case at this point is not right. And otherwise, if the Court does review this case at this point, it's going down the path of reviewing BPA's actions in a piecemeal and bifurcated fashion, which this Court has in a number of other cases said it does not approve. And I would just cite to the Court the Oregon PUC case that we cite in our brief. So in order to avoid that, all Bonneville is asking is that this Court at one time hear all of the facts, have all of the parties before it, and have all of the issues and address in one proceeding BPA's decision to execute the interim agreement. And we believe that there's ample grounds under ripeness to do that, so the case should be dismissed. Now, on to the standing issue, which we've kind of been talking about here as well. I think it's also really key to note that even if there is an injury to Klatskanai, there really isn't much left for this Court to do in terms of addressing it in terms of just the interim payments. I mean, in effect, what Klatskanai is asking this Court to do is set aside the interim payments, which at this point have been superseded by the decisions in the 07 rate case, and there has been a final determination or there's going to be a final determination available, reviewable by this Court underlying that record, and set aside the interim agreements and send it back to BPA with direction to comply with 5C, comply with 7B of the Act, and perform the 84 methodology, all of which Bonneville has already done in the context of the 07. Is the interim agreement terms, is that superseded today, or are you saying it's superseded at some point in the future? The actual payment amount, what the IOUs are entitled to from BPA has been calculated. That has been calculated as part of the 07 supplemental rate case. So in terms of what the IOUs are supposed to get from BPA, we have made that decision and made that calculation pursuant to 5C and 7B and the 84 methodology in the rate case. Now, the actual payment will not occur until the provisions of 9B of the contract have occurred, which is the rate case has to be finalized and any review of the WPO7 rod has to be fully appealed and won't be subject to further appeal. But my understanding is that if the ROD stands and the FERC approval comes through finally and then survives judicial challenge, the result of that 2007 supplemental rate case is that the interim payments to the IOUs are only in partial satisfaction what's owed to them. That is to say, additional money is owed to the IOUs. We're not going to be in a position, if this holds up, of asking money back from IOUs who might, for example, have gone bankrupt and can't pay. Right. BPA owes the IOUs more money at the end of the day. So if they go bankrupt, it's no skin off our nose because we owe them money and they can come after us. That's right. The bankruptcy trustee is coming after you. Right, right, because they're trying to get the money from us. So I see I have about five minutes left, and I'd like just to conclude with this. Again, the key issue in this case is not whether BPA's decision to review the interim agreements and to make these interim payments will be reviewed by this Court. It's simply a matter of timing. It's when. And we believe that it makes a lot more sense to have those issues brought before this Court when the WPO7 record is before it, because at that point, there will be, to the extent there's any injury, it will be, it will have an impact on Klaxonite at that point. The Court will have the entire record before it, can address all the issues in one proceeding, and can review Bonneville's actions at a single time and not in this piecemeal and bifurcated fashion, which this Court has known before it does not approve of. Thank you, Your Honors. Okay. Thank you. Now, you'd ask to save five minutes. Why don't we bump it up to five, Ms. Allison? Okay. And you don't need to use all of them. Thank you, Your Honors. Dan Bagatel on behalf of the Investor-Owned Utilities, Avista, Portland General Electric, and Puget Sound Energy. We, too, in our brief gave three reasons, separate and related reasons, why this Court should not review Klaxonite's current petitions, but instead should consider the record in light of the WPO7 supplemental rod issued in September of 2008. We also agree with Bonneville that the most direct way to get to that result is through the issue of rightness. And the reason for that fundamentally is that Bonneville acted in February and March of 2008 to make interim provisional benefit determinations that were fully reversible. I have scratched my head trying to determine what possible injury Klaxonite could come up with. I haven't found one. The best they seem to be coming up with is some sort of theoretical injury that wouldn't provide standing under the Lujan test. But nevertheless, even if we posit that there might be some theoretical injury, the only way we can determine that is by looking at the ultimate record, which was made in September of 2008. In fact, I think Klaxonite's counsel admitted that this morning. How would that hurt us? We don't know. Well, the way we will know is based on the record that was developed in the WPO7 record of decision. There is no point in determining in the abstract whether the interim agreements hurt anyone because they were superseded, they were intended to be superseded. They're fine. Well, they're not superseded. I mean, they're there. Payments were made under them, and then you make further payments based on what payments were made. So they're not superseded in the sense that they disappeared. They've had a real-world effect. Yes. Yes, Your Honor. What I should have said is that the benefit determinations have been superseded. You're right. What happened in the WPO7 rod was that BPA determined the amount of money that would eventually be owed, and it subtracted off the amount of money that it had previously awarded. Now, and that gets to the second point. What remedy would Klaxonite want or get? Perhaps the Court would run into the agency. What would the agency do? It would undo the subtraction. It would add the money back in, and we'd be right back in the same position. I will repeat that all of the parties have objections to BPA's ultimate benefit determinations. We're not happy. They're not happy. My friend from Snohomish is not happy. We'll all have a chance to brief that in front of this Court. And we'll all have a chance to which we're looking forward to enormously. All right. I bet you're waiting with bated breath. But if the Court has no further questions, I'm willing to cede the remainder of my time. Thank you. Thank you. Well, I did have a question. Maybe you can answer this. If everything Mr. Green says is accurate, and I don't have any reason to think it isn't, what's the motivation for this appeal? They're going to be taken care of. They've already gotten some money. The WPO7 will give them more money. Whether they join the contracts or whether they won't will come up with the same amount. What in your mind is motivating this appeal? I have scratched my head and can't come up with it because I cannot see any way. I'm going to ask counsel on his rebuttal. Yes, Your Honor. Mr. Keeley. Why don't we start out with three minutes? We're going to let you say what you need to say. Thank you, Your Honor. I don't have too much. Why don't we ask Judge Bea's question? I still don't get it. Why are you suing? Your Honor, we don't think that the Bonneville Power Administration should be allowed to circumvent the law. Our concern is, with respect to the current proceeding, I've already addressed that. But we're also concerned about the future. If the BPA can do this now, it can do it again later to anybody it wants to. And that's a great concern for us. The fact that we may be a maverick on this and everybody else bowed to the pressure and took the money, well, they did what they did. But utilitarian convention does not rule here. The law does. And my client happens to be a stickler for the law. That's their right. With respect to Your Honor's point, Judge Fletcher, yours, about the IOUs not conceivably realistically owing any money back, to the extent the Court has a concern about that question. In fact, with reference to page 22 of the industrial utilities brief, one of which is Avista, Avista received $9.6 million under the residential exchange program contract. And according to their brief, the definitive benefit amount as determined in the supplemental proceeding was zero. So some of the IOUs may end up having to repay money. That's right. The case that I was referring to in my argument, in fact, of course, if Avista has no money because they've gone into bankruptcy along with Chrysler, they wouldn't have $9.6 million to pay back. That used to seem pretty far-fetched, didn't it, Your Honor? Who would have thought that the United States government would end up running General Motors? Well, it happened. The case I was referring to was California Energy Resources Conservation and Development Commission v. BPA, 754 F. 2nd, 1470. And the Court reiterates and reaffirms the holding of that PGE v. Johnson case on standing in that case in the opinion. You know, I was looking at the PGE-Johnson case, as I confess, Mr. Green, I was reading something while you were talking, and the standing decision in that case. It was very clear in Judge Sneed's opinion that, in fact, the plaintiff had suffered monetary injury or had alleged sufficient monetary injury. And Judge Sneed's opinion just went on to say, and in any event, they've got a general interest in enforcing the law. So I have trouble taking that one paragraph in Judge Sneed's opinion of saying they've got interest in enforcing the law independently from the rest of the opinion where he discusses the injury that PG&E had. Well, in fact, with respect to the Court's discussion of PG&E's allegations of injury in that case, Your Honor, the allegations were contested by BPA, as ours are in this case. And what the Court said, consistent with prior precedent, is that if there's a financial injury allegation for purposes of standing, that this Court is required to accept that as true. And we have made such an allegation in this case just like PG&E did 25 years ago in that case. And the Court accepted it without analysis or challenge. Thank you, Your Honor. Thank you. And we can hardly wait for the next BPA case. Thank you very much for your good arguments. That's tonight, People's Utility District v. Bonneville Power Administration submitted for decision. We're now in recess, and we will resume tomorrow morning. Thank you. Thank you.
judges: Fletcher W. , Bea, Ikuta